James **VITTITOW**, et al., Plaintiffs,

v.

**CITY OF UPPER ARLINGTON,**
et al., Defendants.

No. C–2–92–991.

United States District Court,
S.D. Ohio, E.D.

Aug. 19, 1993.

Thomas W. Condit, Cincinnati, OH, for plaintiffs.

Louis Abraham Jacobs, Columbus, OH, for defendants.

## OPINION AND MODIFIED PRELIMINARY INJUNCTION ORDER

GEORGE C. SMITH, District Judge.

On November 6, 1992, the Court issued a preliminary injunction in this case (Doc. 9). At the end of the preliminary injunction order, the Court indicated that it would issue a comprehensive opinion and order. What follows is the Court's comprehensive opinion and order addressing the preliminary injunction. Upon further review of the preliminary injunction, the Court finds that the interests of justice require that the order be *sua sponte* modified.

Plaintiffs, who oppose abortion, bring this action under 42 U.S.C. § 1983. Plaintiffs picketed in the City of Upper Arlington in front of and near the home of a physician who allegedly performs abortions. In the instant action, plaintiffs challenge defendants' application of a city ordinance that prohibits residential picketing. All plaintiffs assert deprivation of rights under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs James and Marisa Vittitow additionally assert violation of their Fourth Amendment rights. Plaintiffs seek injunctive relief, monetary damages, and attorney's fees and costs.

## I.

This action arises from plaintiffs' attempts to picket in front of and near the home of a physician who lives in a residential neighborhood in the City of Upper Arlington, Ohio. On April 4, 1992, plaintiffs traveled from Dayton, Ohio to Upper Arlington to picket in the doctor's neighborhood. Plaintiffs maintain that they intended to picket peacefully and lawfully. Plaintiffs parked their cars upon arriving at the neighborhood, gathered briefly, and proceeded to walk up and down the sidewalk, carrying signs expressing their anti-abortion sentiments and indicating their belief that the doctor performed abortions. The doctor lives on a small cul-de-sac.

Upper Arlington police officers confronted plaintiffs during the April 4, 1992 picketing and ordered plaintiffs to cease their activities. Plaintiffs maintain they were aware of a U.S. Supreme Court decision they believed allowed them to picket. They therefore refused to follow the officers' order. The officers then handcuffed plaintiffs James and Marisa Vittitow and detained them in separate police cruisers until the other picketers agreed to leave the area.

In response to citizens' complaints about residential picketing, the Upper Arlington City Council enacted a revised version of

Codified Ordinance § 517.17 on August 24, 1992. Section 517.17 provides as follows:

No person shall engage in picketing before or about the residence or dwelling of any individual in this City.

The Council enacted the ordinance because, "notwithstanding issues of free speech, people are entitled to privacy and sanctity of their own home."

Near the beginning of October 1992, the Dayton Pro–Life Action Line provided an audio-taped message to callers concerning the details of an abortion allegedly performed by the doctor. The message invited callers to leave their names and phone numbers so they could be contacted about a picket against the doctor that was to take place the following Saturday (October 3, 1992). Defendants' Exhibit 4.

Plaintiffs again traveled from Dayton, Ohio to Upper Arlington to picket in the doctor's neighborhood on October 3, 1992. The police report of Upper Arlington Police Sergeant Dwight A. Holcomb fairly summarizes what happened during the October 3 picket:

Dispatched to the area on a report of picketers in the area. On arrival found approx. 20 people with signs concerning abortion. Some signs were directed to the resident who lives at 4556 Penderton Court. The protesters were on the court and walking directly in front of the above address. The protesters were spread out over a distance of approx. 200 feet and continued to walk around the court. A person identified as the group leader and I had a conversation concerning the matter and I felt there was probable cause to believe a crime was being committed. After a short discussion on the matter, the gentleman took his group and removed them from the court. They continued their march down Rosebury Dr. to Crompton, then came back to their autos. The subjects left the area without incident at 14:20 hours.

Defendants' Exhibit 3. Plaintiffs felt threatened with possible arrest by Sergeant Holcomb if they did not leave the cul-de-sac. The evidence, which includes a video tape of some of plaintiffs' picketing, reveals that plaintiffs' picketed quietly; they did not use bullhorns or any other sound amplification devices. They did not chant or shout slogans.

Plaintiffs filed their complaint and motion for temporary restraining order or preliminary injunction on October 29, 1992. At the time of the filing, plaintiffs indicated they desired to continue their picketing in Upper Arlington. *See, e.g.,* Complaint para. 20; Brief in Support of Motion for a Temporary Restraining Order or Alternatively a Preliminary Injunction at 4; Hearing Tr. at 20. Defendants filed a memorandum in opposition to plaintiffs' motion on November 5, 1992. The Court held a hearing on November 6, 1992 to consider plaintiffs' motion. The Court issued a preliminary injunction, without an opinion, on November 6, 1992.

## II.

The standard for determining whether to issue a preliminary injunction or a temporary restraining order requires the Court to consider the following factors:

(1) whether the moving party has a substantial probability of success on the merits; (2) whether irreparable injury will occur if the injunction is not issued; (3) whether the injunction will have a harmful effect on third parties; and (4) whether the public interest would be served by the injunction.

*CSX Transportation, Inc. v. Tennessee State Board of Equalization,* 964 F.2d 548, 556 (6th Cir.1992). The four considerations are factors to be balanced; they are not prerequisites that must be met. *In re DeLorean Motors Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

## III.

The Court will first examine whether there is a significant likelihood that plaintiffs will succeed on the merits.

### A.

Both sides in this conflict recognize the significance to this case of the decision of the U.S. Supreme Court in *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *Frisby,* the plaintiffs picketed out-

side the Brookfield, Wisconsin residence of a doctor who apparently performed abortions. In response, the town of Brookfield enacted the following ban on all residential picketing:

It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield.

Faced with the threat of arrest and prosecution, the plaintiffs in *Frisby* filed an action in federal district court seeking declaratory and injunctive relief, and challenging the facial validity of the ordinance on First Amendment grounds.[1]

The district court in *Frisby* granted the plaintiffs' motion for a preliminary injunction, concluding that the ordinance was not narrowly tailored enough to restrict protected speech in a public forum. An en banc panel of the Seventh Circuit Court of Appeals affirmed. The U.S. Supreme Court reversed, holding that the ordinance was not facially invalid under the First Amendment. *Frisby,* 487 U.S. at 488, 108 S.Ct. at 2504.

The Court in *Frisby* concluded that the residential streets and sidewalks of Brookfield were traditional public fora. *Id.* at 481, 108 S.Ct. at 2500. The Court therefore reviewed the ordinance under the following standard:

The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Id.* (quoting *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983)).

The Court in *Frisby* reached the conclusion that the ordinance was narrowly tailored to serve a significant government interest by applying the principal that "statutes will be interpreted to avoid constitutional difficulties." *Id.* 487 U.S. at 483, 108 S.Ct. at 2501. Specifically, the Court interpreted the statute to prohibit only picketing focused on, and taking place solely in front of, a particular residence.[2] *Id.* at 482, 108 S.Ct. at 2501.

The Court in *Frisby* also concluded that the ordinance served a significant government interest: the protection of residential privacy. *Id.* at 484, 108 S.Ct. at 2502. In doing so, the Court recognized the importance of the privacy of the home, and the legitimacy of protecting unwilling listeners. *Id.* The Court noted the devastating effects of picketing that intrudes upon residential privacy:

To those inside ... the home becomes something less than a home when and while the picketing continues. The tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.

*Frisby,* 487 U.S. at 486, 108 S.Ct. at 2503 (quotes, cites and extraneous punctuation omitted).

As stated above, in *Frisby,* unlike the instant case, the plaintiffs challenged the facial validity of the ordinance. This Court nevertheless finds the principles enunciated in *Frisby* to be highly instructive in the instant case. In particular, the limitations the *Frisby* Court read into the Brookfield ordinance serve as a fair guide as to the extent to which defendants in the instant case may constitutionally enforce the Upper Arlington ordinance. With these principles in mind, the Court will proceed to examine whether in the instant case plaintiffs have demonstrated a substantial likelihood of success on the merits.

1. In contrast, plaintiffs in the instant case do not appear to challenge the facial validity of the Upper Arlington Ordinance. Rather, they challenge the manner in which defendants have applied it.

2. The Court also referred to limits mentioned during oral argument:

[P]icketing would be having the picket proceed on a definite course or route in front of a home. The picket need not carry a sign, but in order to fall within the scope of the ordinance the picketing must be directed at a single residence. General marching through residential neighborhoods, or even walking a route in front of an entire block of houses, is not prohibited by this ordinance.

*Frisby,* 487 U.S. at 483, 108 S.Ct. at 2502 (cites omitted).

## B.

The merits of this case boil down to whether plaintiffs' picketing, which consisted of slow marching around the sidewalks of the cul-de-sac on which the doctor's home is located, constituted "picketing focused on, and taking place in front of, a particular residence". *Frisby*, 487 U.S. at 482, 108 S.Ct. at 2501. There can be no doubt that the doctor was the subject of plaintiffs' picketing. Plaintiffs' intention appears to have been to inform the doctor's neighbors of his activities, and if possible to persuade him to cease those activities. Some if not all of the signs they carried referred specifically to the doctor. In this sense, the doctor's home was the "focus," or, as defendants put it, the "target" of the picketing.

The Court's inquiry does not end here, however. The Court in *Frisby* also limited the ordinance to prohibit only "picketing taking place solely in front of a particular residence." *Frisby*, 487 U.S. at 483, 108 S.Ct. at 2502.

The picketers in *Frisby* do not appear to have been moving continuously while picketing. Rather, they assembled outside the doctor's home. *See* 487 U.S. at 476, 487, 108 S.Ct. at 2498, 2503–04. On the one hand, part of plaintiffs' picketing in the instant case took place in front of the doctor's home as each plaintiff, in turn, passed in front of it. On the other hand, plaintiff's continuously moving picket differs from the apparently static picketing described in *Frisby*, and was not, strictly speaking, "*solely* in front of a particular residence." *Id.* at 483, 108 S.Ct. at 2502 (emphasis added).

■ Nevertheless, the continuous line of picketers marching slowly around the small cul-de-sac and in front of the doctor's home in this case is the functional equivalent of the kind of siege described in *Frisby* that a governmental entity may properly proscribe. At virtually any given moment, one or more of the plaintiffs was in front of the doctor's house. As a result, it would have been nearly impossible for the doctor to leave his house, or back his car out of the driveway, without having to confront one or more of the plaintiffs. Looking out a front window, the doctor would, at any given moment, see one or more picketers on the sidewalk directly in front of his house. The doctor and his family were, in effect, trapped, unwilling recipients of plaintiffs' speech.

In short, the harm the doctor and his family experienced during plaintiffs' picketing rises to the level of harm resulting from the invasion of residential privacy described in *Frisby*. Hence, in the circumstances presented in this case, although defendants could not properly have prevented plaintiffs from picketing in the neighborhood, or even on the small cul-de-sac, they could properly have prevented plaintiffs from walking in front of the doctor's house while picketing.

The instant case presents a very trying set of circumstances for all involved. The plaintiffs are faced with the difficulty of attempting to exercise their legitimate First Amendment rights without breaking the law. Defendant Upper Arlington is faced with the problem of trying to protect its citizens' equally legitimate rights to residential privacy. Between the two, and perhaps in the most difficult position, are the police defendants charged with enforcing the ordinance. Without the luxury of having constitutional scholars accompany them on their assignments, the police officers must make virtually instantaneous, on-the-spot decisions as to whether particular conduct is protected First Amendment expression, or a violation of the ordinance for which a person may properly be arrested. Such decisions are difficult for judges and lawyers even when they have had time to reflect on them, and reasonable judges and lawyers do not even agree on the correct answer.[3]

These real life circumstances have led the Court to modify its original preliminary injunction. The original injunction in this case requires the parties to evaluate such subjective criteria as whether plaintiffs have significantly slowed down in front of the doctor's house, or whether plaintiffs have given a particular residence undue emphasis. These standards are simply unworkable.

---

**3.** *Viz* the concurring and dissenting opinions in *Frisby.*

The Court finds that application of a bright line standard will best serve the competing interests involved. As in the original preliminary injunction, plaintiffs should be allowed to picket in the doctor's neighborhood and even on the cul-de-sac. Defendants, however, may create a limited zone of residential privacy and prevent plaintiffs from picketing in front of: (a) the doctor's home; and (b) the two homes on either side of the doctor's home. This bright line zone of residential privacy is designed to protect plaintiffs' right to free speech as well as defendants' equally significant interest in protecting residential privacy. Moreover, this rule will allow law enforcement officers easily to determine whether a violation of the ordinance has occurred. In the same way, the bright line rule will also allow plaintiffs to comply with the law, as they say they have always intended to do.[4]

The inclusion of the immediate neighbors' houses within the zone of residential privacy is necessary to prevent the kind of siege described in *Frisby*, or its functional equivalent, from occurring.[5] This limitation will allow plaintiffs to disseminate their message in the neighborhood to listeners the Court cannot properly presume are unwilling. At the same time, the zone will, for example, allow the doctor and his family to come to and go from their home without having to directly confront picketers. It will, in essence, prevent them from becoming a "captive" audience of plaintiffs' speech. *See* 487 U.S. at 487, 108 S.Ct. at 2503–04.

In sum, plaintiffs have demonstrated a strong likelihood of success to the extent they challenge defendants' attempt to exclude them entirely from the cul-de-sac on which the doctor lives. The Court will, however, modify the original preliminary injunction.

**IV.**

The Court must next consider whether irreparable harm will result if the injunction is not granted. A violation of a person's right to free speech protected by the First Amendment and the deprivation of the Fourth Amendment protection against unlawful arrest constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965). The Court finds that future violations against plaintiffs are likely to occur in the absence of a preliminary injunction. This factor also weighs in favor of the granting of a preliminary injunction.

**V.**

The Court must also consider whether the injunction will have a harmful effect on third parties. The granting of an injunction will allow the picketing in the doctor's neighborhood to continue. Although the Court did not receive evidence on this issue, it is likely that the picketing, even under the modified preliminary injunction, may cause the doctor to feel uncomfortable or embarrassed. Nonetheless, the degree of harm the doctor may suffer does not rise to a level sufficient to warrant further curtailing plaintiffs' rights under the First Amendment. Overall, this factor does not weigh against the granting of a preliminary injunction.

**VI.**

Lastly, the Court must determine whether an injunction would serve the public interest. This case presents competing public interests. On the one hand, the public has an interest in protecting residential privacy. On the other hand, the public also has an

---

4. The Court recognizes that even this bright line rule may not address every conceivable kind of residential picketing. The rule assumes that plaintiffs will continue to picket as they have in the past: quietly and without the use of any sound amplification equipment, and that they will move continuously while picketing. The Court does not mean to suggest that the only way the ordinance can be constitutionally enforced is when someone intrudes upon the area described.

In different circumstances, the limited zone of residential protection may have to be larger.

5. *Cf. Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 66–68 (3rd Cir.1991) (holding that district court's 2500 foot radius zone of protection against targeted residential picketing was unwarranted in the absence of findings that unusual or extraordinary circumstances were present).

interest in the preserving the right to free speech. The Court finds that in the particular circumstances presented in this case, and under the modified preliminary injunction, the public interest in protecting free speech prevails. The final factor weighs in favor of granting an injunction.

## VII.

Based on the above, and all the arguments and evidence presented to the Court, the Court HOLDS that plaintiffs' motion for a preliminary injunction is meritorious, and that plaintiffs are entitled to at least part of the relief they requested.

## VIII.

The following provisions shall supersede the provisions stated in the Court's November 6, 1992 preliminary injunction:

The Court preliminarily **ENJOINS** defendants as follows:

1. Defendants may not prevent plaintiffs from picketing in any particular residential neighborhood, street or cul-de-sac.

2. Defendants may, however, properly prevent plaintiffs from picketing in front of: (a) the doctor's home, and (b) the two homes on either side of the doctor's home.

3. Similarly, defendants may properly prevent plaintiffs or others from picketing in front of: (a) the home of anyone defendants have probable cause to believe is the target, focus or subject of the picketing, as well as (b) the two homes on either side of the home just described.

**IT IS SO ORDERED.**