James VITTITOW, et al., Plaintiffs–
Appellants, Cross–Appellees,

v.

CITY OF UPPER ARLINGTON,
et al., Defendants–Appellees,
Cross–Appellants.

Nos. 93–4034, 93–4086.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 4, 1994.

Decided Jan. 12, 1995.

Thomas W. Condit (argued and briefed), Condit & Dressing, Cincinnati, OH, for plaintiffs-appellants, cross-appellees.

Louis A. Jacobs (argued and briefed), Columbus, OH, for defendants-appellees, cross-appellants.

Before: KENNEDY, MARTIN, and GUY, Circuit Judges.

GUY, J., delivered the opinion of the court, in which KENNEDY, J., joined.

MARTIN, J. (pp. 1107–1112), delivered a separate dissenting opinion.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiffs brought this action against defendant, the City of Upper Arlington, alleging that the City's enforcement of an ordinance banning residential picketing violated their First Amendment rights. After issuing a preliminary injunction prohibiting enforcement of the ordinance as written, the district court modified its injunction to prohibit residential picketing in front of a targeted home as well as the two homes on either side of the targeted home. Both the plaintiffs and the City appeal the court's modified injunction. We reverse and remand.

## I.

Plaintiffs are anti-abortion activists who reside in Dayton, Ohio. In addition to employing various other tactics, plaintiffs support their cause by means of residential picketing. Plaintiffs engage in such picketing "in order to bring their message to the community and to call the abortionist to repentance and to change what he does for a living for the sake of preborn babies."

In 1991, plaintiffs began a picketing campaign that had as its target Raymond Robinson, a doctor who lives in Upper Arlington and performs abortions in Dayton. Robinson's house is on a cul-de-sac that is approximately 465 feet from one end to the other. There are only a few other houses on the same cul-de-sac.

After their initial visit in 1991, plaintiffs again travelled to Robinson's neighborhood in April 1992. Plaintiffs made numerous passes back and forth in front of four houses, including Robinson's house. Plaintiffs were then confronted by officers of the Upper Arlington Police Department (UAPD), who ordered plaintiffs to cease picketing. After plaintiffs ignored the order, plaintiffs James and Marisa Vittitow were "arrested" and detained in separate police vehicles. The Vittitows were released after the other picketers agreed to leave the area.

In August 1992, the Upper Arlington City Council responded to citizens' complaints regarding residential picketing by revising section 517.17 of the City's codified ordinances to read: "No person shall engage in picketing before or about the residence or dwelling of any individual in this City."

Plaintiffs returned to Upper Arlington in October 1992.[1] Although the group, which numbered roughly 20,[2] traversed the entire cul-de-sac, they paid particular attention to the area in front of Robinson's house. The picketers spread themselves out and moved slowly, but as Glen Willer, a UAPD detective, explained, "once they got to the front of Dr. Robinson's house, the line appeared to compress to some degree." Willer added: "They slowed to a very slow pace [in front of Robinson's home], but however, I wouldn't describe it as having stopped."

Although James Vittitow denied having recorded the message himself, he did admit to having heard the message prior to embarking on the October trip to Upper Arlington. Vittitow further admitted that he knew the woman who had recorded the message—a woman he identified as Dawn Thomas—and that he had associated with her in the past "doing pro-life activities."

1. This visit was publicized via the following recorded message on the Dayton Pro–Life Action Line:

Hi. Thanks for calling the Dayton Pro–Life Action Line. Well, I want to let you know right away that there is a picket this Saturday, October 3rd, there in Columbus outside the office or home of abortionist Raymond Robinson. He is the abortionist who comes to Dayton and does abortions at 1829 North Main Street.

2. Approximately 12 had participated in the April 1992 demonstration.

A police report prepared by UAPD Sergeant Dwight Holcomb recounted:

> Dispatched to the area on a report of picketers in the area. On arrival found approx. 20 people with signs concerning abortion. Some signs were directed to the . resident who lives at 4556 Benderton Court. The protesters were on the Court and walking directly [in front] of the above address. The protesters were spread out over a distance of approx. 200 feet and continued to walk around the court. A person identified as the group leader and I had a conversation concerning the matter and that I felt there was probable cause to believe a crime was being committed. After a short discussion on the matter, the gentleman took his group and removed them from the court. They continued their march down Rosebury Dr. to Crompton, then came back to their autos. The subjects left the area without incident at 14:20 hours.[3]

Once plaintiffs left the cul-de-sac, the protest proceeded without incident. Plaintiffs continued to march for approximately 35 minutes, during which only one UAPD officer, Holcomb, stayed at the scene.

Plaintiffs initiated this action on October 29, 1992, seeking declaratory and injunctive relief. In their complaint, plaintiffs claimed that section 517.17, as interpreted and enforced by the City of Upper Arlington, violated their constitutional rights to free speech and assembly on residential streets and sidewalks. In addition, plaintiffs filed a motion for a temporary restraining order or a preliminary injunction. After a hearing was held on plaintiffs' motion, the district court issued an order preliminarily enjoining the City from enforcing the ordinance as written.

The court's order, however, did provide for conditional enforcement:

> Enforcement of the ordinance is subject to the following:
> 1) Picketers shall continue moving at all times and shall not stop or gather in front of or around any residence;
> 2) Picketers shall not give undue emphasis to directing their activities to one residence;
> 3) The presence or absence of signs, banners, etc. shall not in any way diminish or enhance the activities of the picketers;
> 4) Picketers shall at all times be mindful of the legitimate and compelling interest of the City of Upper Arlington to maintain traffic and safety—particularly as it applies to children. Picketers are directed to obey any legitimate orders of the police concerning the safety of those in the area being picketed;
> 5) The City of Upper Arlington shall adopt, issue and post appropriate written authority to comply with this Order within thirty (30) days of the issuance of the Court's pending Opinion and Order.

In issuing its order, the district court noted that a comprehensive order and opinion would be forthcoming. Apparently, the process of crafting an opinion caused the court to rethink its earlier position somewhat. In its opinion, the court explained: "Upon further review of the preliminary injunction, the Court finds that the interests of justice require that the order be *sua sponte* modified." *Vittitow v. City of Upper Arlington*, 830 F.Supp. 1077, 1078 (S.D.Ohio 1993). This modified version stated as follows:

> On my arrival, I observed signs, specifically, talking about Dr. Robinson's house by address and by his name, and the group was compacted on Benderton Court, which is a very small court. . . .
> Looking at the entire amount of information that I had, at that time, I felt that the group was targeting and focusing on Dr. Robinson's home.

---

**3.** Holcomb explained how he arrived at his probable cause determination:

> I looked at the totality of everything that I knew at the time, the history for Dr. Robinson's home, the history for 4556 Benderton Court.
> I looked at the information that we had, that we suspected on Saturday, October 3 of 1992 that a group would appear. We had the tape recording that we had monitored that was recruiting people to come to Upper Arlington and to specifically to Dr. Robinson's home.

1. Defendants may not prevent plaintiffs from picketing in any particular residential neighborhood, street, or cul-de-sac.

2. Defendants may, however, properly prevent plaintiffs from picketing in front of: (a) the doctor's home, and (b) the two homes on either side of the doctor's home.

3. Similarly, defendants may properly prevent plaintiffs or others from picketing in front of: (a) the home of anyone defendants have probable cause to believe is the target, focus or subject of the picketing, as well as (b) the two homes on either side of the home just described.

*Id.* at 1083.[4]

Both parties appeal this later injunction.

## II.

■ Plaintiffs first contend that the district court's modified injunction is content-based and that therefore the injunction must be reversed under a strict scrutiny standard. With respect to plaintiffs' premise, the Supreme Court's recent decision in *Madsen v. Women's Health Center, Inc.*, —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), is instructive. In *Madsen,* a group of anti-abortion protesters were enjoined by a Florida state court from interfering with public access to an abortion clinic and from physically abusing people attempting to enter or exit the clinic. Six months after the clinic had obtained this injunction, it successfully sought to broaden the injunction, arguing that the protesters had persisted in blocking access to the clinic. The Florida Supreme

Court subsequently upheld the modified injunction. Finding the injunction to be content-based, however, the Eleventh Circuit invalidated the injunction. The Eleventh Circuit concluded "that the asserted interests in public safety and order were already protected by other applicable laws and that these interests could be protected adequately without infringing upon the First Amendment rights of others." *Id.* at ——, 114 S.Ct. at 2523.

The *Madsen* Court took issue with the Eleventh Circuit's conclusion that the injunction was content-based. The Court observed:

> To accept petitioners' claim [that the injunction is content or viewpoint based] would be to classify virtually every injunction as content or viewpoint based. An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.
>
> The fact that the injunction in the present case did not prohibit activities of those demonstrating in favor of abortion is justly attributable to the lack of any similar demonstrations by those in favor of abortion,

4.· The district court shed light on what changed its mind:

> Without the luxury of having constitutional scholars accompany them on their assignments, the police officers must make virtually instantaneous, on-the-spot decisions as to whether particular conduct is protected First Amendment expression, or a violation of the ordinance for which a person may properly be arrested. Such decisions are difficult for judges and lawyers even when they have had time to reflect on them, and reasonable judges and lawyers do not even agree on the correct answer.
>
> These real life circumstances have led the Court to modify its original preliminary injunction. The original injunction in this case requires the parties to evaluate such subjective criteria as whether plaintiffs have significantly

> slowed down in front of the doctor's house, or whether plaintiffs have given a particular residence undue emphasis. These standards are simply unworkable.
>
> The Court finds that application of a bright line standard will best serve the competing interests involved.... This bright line zone of residential privacy is designed to protect plaintiffs' right to free speech as well as defendants' equally significant interest in protecting residential privacy. Moreover, this rule will allow law enforcement officers easily to determine whether a violation of the ordinance has occurred. In the same way, the bright line rule will also allow plaintiffs to comply with the law, as they say they have always intended to do.

830 F.Supp. at 1081–82 (footnotes omitted).

and of any consequent request that their demonstrations be regulated by injunction. There is no suggestion in this record that Florida law would not equally restrain similar conduct directed at a target having nothing to do with abortion; none of the restrictions imposed by the court were directed at the contents of petitioner's message.

Our principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech "without reference to the content of the regulated speech." We thus look to the government's purpose as the threshold consideration. Here, the state court imposed restrictions on petitioners incidental to their antiabortion message because they repeatedly violated the court's original order. That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic. In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based.

*Id.* at —————, 114 S.Ct. at 2523–24 (citations omitted).

The language in *Madsen* applies with equal force in this case. Here, too, "none of the restrictions imposed by the court were directed at the contents of [plaintiffs'] message." The injunction (as well as the ordinance) seeks to regulate not plaintiffs' message, but rather the means by which plaintiffs seek to convey their message. That plaintiffs are anti-abortion activists, as opposed to union or environmental activists, is immaterial. So long as they focus their picketing effort on the residence of a particular individual, they are subject to prosecution. *Cf. Ater v. Armstrong,* 961 F.2d 1224, 1227 (6th Cir.) (restriction at issue deemed content-neutral because it "applies evenhandedly to all those who wish to distribute written materials or solicit funds"), *cert. denied,* —

U.S. ——, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992).

Because we reject plaintiffs' premise that the modified injunction is content-based, we do not subject the injunction in dispute to strict scrutiny analysis. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) ("[Under strict scrutiny analysis, f]or the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."); *see also id.* ("[Under intermediate scrutiny analysis, t]he State may ... enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."). Instead, we must abide by the standard the Supreme Court devised in *Madsen.* As the Court noted: "[W]hen evaluating a content-neutral injunction ... *[w]e must ask instead whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest.*" —— U.S. at ——, 114 S.Ct. at 2525 (emphasis added).

■ Initially, we note that a significant government interest is, indeed, at stake in this case. As the Supreme Court has made clear:

"The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society. Our prior decisions have often remarked on the unique nature of the home, "the last citadel of the tired, the weary, and the sick," and have recognized that "[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value."

One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. "That we are often 'captives' outside the sanctuary of the home and subject to ob-

jectionable speech ... does not mean we must be captives everywhere." Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom."

*Frisby v. Schultz,* 487 U.S. 474, 484–85, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (citations omitted).

Having determined the existence of a significant government interest, we now consider whether the challenged provisions burden no more speech than is necessary to serve that interest. Plaintiffs would have us answer this question in the negative. They contend that the district court's modified injunction would "allow[ ] the City to arrest and prosecute individuals for doing little more than walking down a city sidewalk."

Two cases in particular inform our analysis of this issue. First, in *Frisby,* a group of anti-abortion activists challenged a Brookfield, Wisconsin, ordinance that, like the Upper Arlington ordinance discussed above, prohibited residential picketing. Specifically, the ordinance provided: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." 487 U.S. at 477, 108 S.Ct. at 2498. In upholding the ordinance, the Court, unlike the lower courts, construed it narrowly to avoid constitutional difficulties.[5] Under the Court's reading, "to fall within the scope of the ordinance the picketing must be directed at a single residence." *Id.* at 483, 108 S.Ct. at 2502. The Court added: "General marching through residential neighborhoods, or even walking a route in front of an entire block of houses, is not prohibited by this ordinance. Accordingly, we construe the ban to be a limited one; *only focused picketing taking place solely in*

*front of a particular residence is prohibited." Id.* (citation omitted) (emphasis added).

In *Madsen,* the Court reviewed what it deemed to be a content-neutral injunction directed at the conduct of anti-abortion protesters. This injunction, like the district court's modified injunction here, established a zone of protection; the injunction prohibited the protesters from "picketing, demonstrating, or using sound amplification equipment within 300 feet of the residences of clinic staff." —— U.S. at ——, 114 S.Ct. at 2529. Although the Court acknowledged the significant state interest in protecting the " 'well-being, tranquility, and privacy of the home,' " *id.* at ——, 114 S.Ct. at 2530 (quoting *Frisby,* 487 U.S. at 484, 108 S.Ct. at 2502), it nevertheless struck down the 300–foot zone, ruling that it was excessive in scope. Hewing closely to its prior decision in *Frisby,* the Court observed:

> [T]he 300–foot zone around the residences in this case is much larger than the zone provided for in the ordinance which we approved in *Frisby.* ... The prohibition [in *Frisby* ] was limited to "focused picketing taking place solely in front of a particular residence." By contrast, the 300–foot zone would ban "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses."

*Madsen,* —— U.S. at ——, 114 S.Ct. at 2530 (citations omitted).

*Madsen,* however, makes it clear that any linear extension beyond the area "solely in front of a particular residence" is at best suspect, if not prohibited outright.[6] The Court counseled in this regard: "[I]t appears that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." *Id.*

The City also takes issue with the bright-line standard adopted by the district court. The City maintains that "[p]rinciples of fed-

---

5. The lower courts read the ordinance as "banning 'all picketing in residential areas.' " 487 U.S. at 482, 108 S.Ct. at 2501.

6. We additionally note in this case that the court's injunction was vague as to the exact scope of the zone created. The parties could not

agree, nor could we discern on our own, whether the protected zone was one house on each side of a targeted residence (a three-house zone) or two houses on each side of a targeted residence (a five-house zone).

eralism dictate deference to the City of Upper Arlington's choice about how to enforce its laws." The City adds: "Absent a finding of fact or conclusion of law that good faith probable cause determinations are an unconstitutional way to enforce an ordinance prohibiting residential picketing, the District Court had no right to impose its enforcement mechanism on the City of Upper Arlington."

Although this argument is less than clear, we assume the City is saying that, if the ordinance is facially valid, whether its enforcement violates the Constitution will have to be decided on a case-by-case basis. We have no quarrel with this principle in the abstract, but, here, the court was faced with a videotape and testimony demonstrating how the City did enforce the ordinance. The record made in the district court indicates the City was enforcing this ordinance in a manner contrary to the teaching of *Madsen.*

### III.

Although one resolution of the issues presented in this appeal simply would be to remand for reconsideration in light of *Madsen,* we elect not to take this approach.

■ The language of the ordinance adopted by the City of Upper Arlington is identical to that construed by the Supreme Court in *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). The ordinance construed by the Court in *Frisby* was unconstitutionally overbroad as written but was saved by the extraordinary measure of accepting counsel's representation at oral argument before the Supreme Court as to how the ordinance would be enforced. Although there is precedent for this approach, four Justices were highly critical of saving the ordinance by this device. In his dissent, Justice Stevens offered a simple and practical alternative:

> [I]t is a simple matter for the town to amend its ordinance and to limit the ban to conduct that unreasonably interferes with the privacy of the home and does not serve a reasonable communicative purpose.

487 U.S. at 499, 108 S.Ct. at 2510 (Stevens, J., dissenting).

Notwithstanding the procedure adopted in *Frisby,* we know of nothing that *requires* us to accept representations from the City's counsel under the circumstances presented here. To begin with, it is not at all clear what representations we received, if any. Second, it is not clear that counsel can bind either the legislative body of the City or its police department. And third, the record in this case demonstrates that the City's idea of what constitutes an enforcement procedure that does not offend the Constitution, conflicts with the *Madsen* holding.

Recently, in construing another municipal ordinance, Judge Martin wrote:

> It is well recognized that federal "courts do not rewrite statutes to create constitutionality." *Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991). As this Court recently emphasized:
>
>> A federal court must always be aware of the federalism concerns that arise whenever it deals with state statutes. The principles of federalism forbid a federal appellate court to arrogate the power to rewrite a municipal ordinance.'
>
> *Id.* at 1125 (citation omitted). It would therefore be improper for this Court to supply limiting language for Akron's public indecency ordinance in order to preserve its constitutionality.

*Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 136 (6th Cir.1994).

The City enacted this ordinance long after the decision in *Frisby* was issued and should have been well aware of the pitfalls in attempting to enforce an ordinance worded this broadly. Common sense would dictate that the City build on what could be learned from *Frisby* and not adopt wording so questionable that a federal district judge, a divided Seventh Circuit Court of Appeals, and four Supreme Court Justices found it to be overbroad.

Finally, and most important, the videotape and the testimony in this case indicate how the City reads *Frisby* in enforcing this ordinance. The videotape (Plaintiffs' Exhibit H) demonstrates that the City's police view the ordinance as violated when they can discern one residence as being the target of picket-

ing. In our view, that is a misreading of *Frisby.* All picketing of this nature will have a target, otherwise it is not really picketing. *Frisby* could not be more clear: "[O]nly focused picketing *taking place solely in front of a particular residence* is prohibited." 487 U.S. at 483, 108 S.Ct. at 2502 (emphasis added).

■ The trial judge tried to save this ordinance with a one-size-fits-all injunction, but narrowing the ordinance, at least in the first instance, is the job of the City, not the trial judge. This is not a case where the target of the picketing has come to court seeking an injunction. In such a case, the trial judge rightfully undertakes to define the rights of the parties in an appropriately worded injunction, if an injunction is called for. Here, however, an ordinance was at issue. The City is right in this regard. *If* the ordinance passes muster, the City is entitled to enforce it. A plaintiff is not entitled to an advisory opinion as to how the ordinance might be enforced.

Since we find the complete ban on residential picketing mandated by the ordinance to be inconsistent with the most recent pronouncements of the Supreme Court, we reverse and remand with instructions to enter a permanent injunction barring enforcement of *this* ordinance *as written.* Obviously, we pass no judgment on what the City may come up with as a substitute.

**REVERSED** and **REMANDED.**

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

Because I believe the majority has ignored the implications of the procedural posture of this case, I respectfully dissent.

This case comes to us on appeal by both parties from the district court's Opinion and Modified Preliminary Injunction Order. Needless to say, a preliminary injunction is an equitable remedy the purpose of which is to maintain the relative positions of the parties until proceedings on the merits can be conducted. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *see also Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 102

(6th Cir.1991); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). A preliminary injunction hearing under Federal Rule of Civil Procedure 65 is not a proceeding *on the merits* unless the district court chooses to combine the hearing on the preliminary injunction with a hearing on the merits. As Federal Rule of Civil Procedure 65(a)(2) provides:

> Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

In *Camenisch,* the Supreme Court commented on the difference between a Rule 65 preliminary injunction hearing and a Rule 65(a)(2) consolidated proceeding and the nature of the judicial task in each:

> [I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.
>
> Should an expedited decision on the merits be appropriate, Rule 65(a)(2) of the Federal Rules of Civil Procedure provides a means of securing one. That Rule permits a court to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Before such an order may issue, however, the courts have commonly required that "the parties should normally receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases."

*Camenisch,* 451 U.S. at 395, 101 S.Ct. at 1834 (citations omitted).

In this case, the district court did not consolidate the proceedings pursuant to Rule

65(a)(2). It is clear from the record that the merits of this action have not been heard or decided. Indeed, as observed in *Camenisch,* any findings of fact or conclusions of law made by the district court for purposes of issuing a preliminary injunction are not binding on the parties or the court during subsequent proceedings on the merits. In fact, this Court has distinguished between findings of fact and conclusions of law made by a district court after a hearing on a preliminary injunction and those made after a consolidated hearing.

> Although evidence received at a Rule 65(a) hearing may enter the trial record, the court's findings of fact and conclusions of law with regard to the preliminary injunction are not binding at trial. Based, as they usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions should not be used outside the context in which they originally were rendered. Consequently, it is inappropriate for the court at a Rule 65(a) hearing to make findings of fact or conclusions of law that go beyond what is necessary to decide whether a preliminary injunction should be issued.

*Brown v. International Bhd. of Elec. Workers, Local Union No. 58 AFL–CIO,* 936 F.2d 251, 256 (6th Cir.), *reh'g denied* (1991) (citing Wright, Miller, Federal Practice and Procedure § 2950, p. 494; *see also Mayo v. Lakeland Highlands Canning Co.,* 309 U.S. 310, 60 S.Ct. 517, 84 L.Ed. 774 (1940)). While the district court in this case may have had more evidence or more time to consider whether to issue the preliminary injunction than is usual, neither of these factors transforms the district court's findings or conclusions into final findings of fact or conclusions of law regarding the merits of the plaintiffs' complaint, absent consolidation under Rule 65(a)(2). Additionally, while the Supreme Court in *Camenisch* observed that "it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits," thus allowing for the possibility that a district court might be able to issue a final decision on the merits in a preliminary injunction hearing, the district court in this case did not do so.

To date, the district court has not conducted proceedings on the merits, including conducting a trial by jury, if necessary (and as plaintiffs have demanded). To date, the district court has not decided whether to grant declaratory relief regarding whether the defendants have unconstitutionally enforced Upper Arlington City Ordinance § 517.17, or whether this ordinance can be constitutionally enforced. To date, the district court has not had the opportunity to decide whether to issue a permanent injunction barring enforcement of this ordinance. We do not have a ruling before us from the district court on the merits and it is premature for us to pass on the merits before the district court has had the opportunity to do so. The limited task before this Court, therefore, is to review the district court's decision granting the preliminary injunction.

It is well-established that this Court reviews the decision of a district court to grant a preliminary injunction for abuse of discretion. *Washington v. Reno,* 35 F.3d 1093, 1098 (6th Cir.1994); *Keweenaw Bay Indian Community v. Michigan,* 11 F.3d 1341, 1348 (6th Cir.1993); *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992); *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259 (6th Cir. 1988). As we have said, the decision of a district court to grant a preliminary injunction is

> generally accorded a great deal of deference on appellate review and will only be disturbed if the court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.

*Michigan Coalition v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991) (citations omitted), *rev'd on other grounds,* 954 F.2d 1174 (6th Cir.1992).

When a district court is asked to issue a preliminary injunction, it does not consider the merits of the case, but rather balances four factors in determining whether to issue the injunction. These well-established factors are:

> (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim;

(2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief;

(3) the probability that granting the injunction will cause substantial harm to others; and

(4) whether the public interest is advanced by the issuance of the injunction.

*Washington*, 35 F.3d at 1099. This Court has said that these factors are not prerequisites to be met, but factors to be balanced. *In re DeLorean*, 755 F.2d at 1229. As to the first factor, the party requesting the injunction need not show a strong likelihood of success on the merits, nor a substantial likelihood of success, but must show that the merits of the case present a sufficiently serious question to justify further investigation of the merits. *Id.* at 1230.

When balancing these factors and deciding whether to issue a preliminary injunction, the Supreme Court has cautioned that a district court should decide only those issues which are presented to it and which are necessary to determine whether to order a preliminary injunction. In *Mayo v. Lakeland Highlands Canning Co.*, the Supreme Court held that a district court committed serious error when it decided whether a state statute was constitutional on a motion for a preliminary injunction. 309 U.S. at 316, 60 S.Ct. at 520. In *Mayo*, Florida citrus growers filed a complaint for temporary and final injunctive relief against enforcement of a Florida statute, the Growers' Cost Guarantee Act. The statute gave the Florida Commissioner of Agriculture emergency power to set the price paid for citrus fruit and a related statute provided that any "dealer" (including growers) could lose its license by violating the Act. The plaintiffs alleged that the statute violated several of their constitutional rights, including their Fifth and Fourteenth Amendment rights. During the preliminary injunction hearing, the Commissioner asked the district court to "pass on all questions presented, and especially on the constitutionality of the Act." *Id.* The district court found the Act to be unconstitutional, but issued the injunction for other reasons. The Supreme Court vacated the preliminary injunction and remanded, stating:

We think the court committed serious error in dealing with this case upon motion for temporary injunction. The question before it was not whether the act was constitutional or unconstitutional; was not whether the Commission had complied with the requirements of the act, if valid, but whether the showing made raised serious questions, under the federal Constitution and the state law, and disclosed that enforcement of the act, pending final hearing, would inflict irreparable damages upon the complainants.

*Id.* In a paragraph that is less than clear, *Mayo* contains some language indicating that, where the parties argue the constitutionality of the statute in proceedings on a preliminary injunction, the district court may consider the issue. *Mayo*, 309 U.S. at 317, 60 S.Ct. at 520. However, the Supreme Court concludes that, where the district court confines itself to the issue presented [the issuance of the preliminary injunction], the proper standard of review is abuse of discretion and only the findings of fact and conclusions of law actually made should be reviewed. *Id.*

In the present case, after reviewing the district court's findings and conclusions regarding the four factors it was required to balance, I find no clear error in the district court's findings and no abuse of discretion in its application of these four factors to the facts. Therefore, I would affirm its decision to grant the injunction. As to the first factor, the likelihood of success on the merits, the majority's opinion supports my view that we should affirm the district court. The majority has reached the merits of the central questions in this case—whether the ordinance was enforced in a constitutional manner and whether it is constitutional at all—and has decided that the plaintiffs are likely to succeed on the merits. The majority should have stopped its analysis there and affirmed the district court as to the propriety of issuing the injunction, assuming they find no error in the district courts' findings and conclusions on the other factors.

The final step of this Court's review of the preliminary injunction is a review of the scope of the injunction. The district court

may abuse its discretion not only in determining whether to grant a preliminary injunction, but also in delineating the scope of that injunction. This is the crux of the parties' dispute—whether the three (or five) house buffer zone is constitutional under *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), and under a case decided since the parties briefed the issues, *Madsen v. Women's Health Ctr., Inc.*, —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Because the size of the buffer zone at issue here is unclear, I would construe the injunction as creating a three-house zone and would remand for the district court to clarify its order accordingly.

This Court's interpretation of *Frisby* will determine whether the scope of the present injunction is constitutional under *Frisby*. In *Frisby*, the Supreme Court was attempting to interpret a Brookfield, Wisconsin ordinance so as to avoid constitutional difficulties. In attempting to so interpret the Brookfield ordinance, the court did not set out to prescribe what a constitutional injunction might look like in every instance of focused residential picketing. Also, the opinion tried to balance the residential privacy interests of the homeowner with the First Amendment rights of the picketers who were, as here, engaged in focused, targeted picketing. It justified its decision by emphasizing the importance of protecting residential privacy, including the state's interest in protecting

> the well-being, tranquility, and privacy [of the home] ... the unique nature of the home, "the last citadel of the tired, the weary, and the sick"... the one retreat to which men and women can repair to escape the tribulations of daily pursuits ... [where they have the] ability to avoid intrusions ... [and refuge for] the unwilling listener.

*Frisby*, 487 U.S. at 474, 484–85, 108 S.Ct. at 2495, 2502. Further, it observed "[t]hat [because] we are often 'captives' outside the sanctuary of the home and subject to objectionable speech does not mean we must be captives everywhere." *Id.* at 484, 108 S.Ct. at 2502.

Focused, targeted picketing can infringe these privacy interests even when the picket-

ers are not standing on the sidewalk adjacent to a person's property. The case before us presents a set of facts where the residential dweller's interests continue to be infringed by the picketers' activities. Thus, given the rationale in *Frisby* for balancing the constitutional rights involved, I do not interpret *Frisby* to mean that other forms of targeted, focused residential picketing, besides that taking place solely in front of one home, may not be banned. The court in *Frisby* said:

> Here the picketing is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt:
>
> > " 'To those inside ... the home becomes something less than a home when and while the picketing ... continue[s] ... [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.' "

*Frisby*, 487 U.S. at 486, 108 S.Ct. at 2503 (citing *Carey v. Brown*, 447 U.S. 455, 478, 100 S.Ct. 2286, 2299, 65 L.Ed.2d 263 (1980) (Rehnquist, J., dissenting), *quoting Wauwatosa v. King*, 49 Wis.2d 398, 182 N.W.2d 530, 537 (1971)).

In *Frisby*, the Court also stated that "[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech". *Id.* at 487, 108 S.Ct. at 2504. Thus, I believe that the picketers may be prevented from engaging in targeted picketing, even when their method of targeting includes slow marching, if their method of picketing continues to infringe on the privacy interests mentioned above, when, for example, the picketers create a situation where the target of the picket is a captive audience

or whose residence is under siege. Merely because the plaintiffs chose to march slowly by other residences, as well as the targeted residence, does not insulate their activity from regulation. The targeted homeowner is as much a captive audience when picketers repeatedly march in front of a home as when they are standing still. The psychological injury and disturbance to the tranquility of the home are not reduced because the picketers are marching slowly. The district court properly sought to curb the undesirable effects of plaintiffs' targeted picketing by enjoining plaintiffs from entering a buffer zone around the targeted home and therefore I would affirm the scope of this injunction under *Frisby*.

Turning now to *Madsen*, an initial problem for me is whether we have a new test for determining the constitutionality of content-neutral injunctions. *Id.* at ——, 114 S.Ct. at 2538 (Scalia, J., concurring in part and dissenting in part) ("The [majority] does not give this new standard a name, but perhaps we could call it intermediate-intermediate scrutiny. The difference between it and intermediate scrutiny . . . is frankly too subtle for me to describe"). The "intermediate-intermediate" test described in *Madsen* requires this Court to ask "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen*, —— U.S. at ——, 114 S.Ct. at 2524. Because the *Madsen* test does not alter my analysis, I wonder if this is a "new" test for content-neutral injunctions.

In *Madsen*, the Supreme Court struck down a 300–foot buffer zone around the residences of abortion clinic staff because it is "much larger than the zone provided for in *Frisby*" and because the ban would include "general marching through residential neighborhoods, or even walking a route in front of an entire block of houses." *Id.* at ——, 114 S.Ct. at 2529 (quoting *Frisby*, 487 U.S. at 483, 108 S.Ct. at 2502). First, I believe the *Madsen* Court incorrectly read *Frisby* as creating a "zone." *Frisby* did not create a "zone," but provided a constitutional construction of the ordinance at issue. *Frisby* prohibited focused picketing taking place

solely in front of a particular residence. If *Frisby* created a "zone," we have no idea how large the "zone" is, i.e. how far back from the front of a house picketers must be, et cetera. Second, *Madsen* struck down a 300–foot zone on the facts of the case. The *Madsen* court stated that the record before it did not justify the 300–foot buffer zone and suggested that "a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." *Id.* at ——, 114 S.Ct. at 2529.

The three-house zone provided for here is no more burdensome than necessary to protect the significant governmental interest in protecting residential privacy. *Id.* at ——, 114 S.Ct. at 2524. The plaintiffs may still march through the neighborhood, on the cul-de-sac, and even in front of the targeted house (though at a distance). Based on the foregoing, I would affirm the district court's decision, finding that its three-house zone is constitutional in light of *Frisby* and *Madsen*. Under these facts, the three-house zone is justified and is no larger than necessary to prevent the targeted homeowner and his family from being captives and to protect their other residential privacy interests. The picketers have ample alternative means of communication, including the ability to continue their picket on the targeted homeowner's street. In fact, given the small size of the cul-de-sac, the district court may have been justified had it also limited the number of picketers who could picket on the cul-de-sac. *Id.* at ——, 114 S.Ct. at 2529.

Finally, though *Madsen* approved a thirty-six foot buffer zone in that case, a buffer zone may not adequately protect the residential privacy interests in this case. Homeowners' privacy interests may not be adequately protected by a zone when invasion-like residential picketing occurs. In this case, the City of Upper Arlington received several complaints about the picketing, including complaints from "non-targeted" homeowners on the cul-de-sac. Some of those homeowners likely experienced a similar invasion of their privacy—were captive audiences to unwanted speech, maybe were hesitant to let their children go outside while

so many strangers were on the sidewalks, were hesitant to go outside themselves, or drive their cars out their driveways because they might have an unpleasant or threatening encounter with one or more of the picketers. Therefore, had the district court limited the picketers to picketing at the end of the street, in my view such an injunction would have more equitably balanced the interests involved.

To resolve this case, this Court had to consider *Madsen* because the residential streets and sidewalks involved are "traditional public fora." However, perhaps it is time for the Supreme Court to consider modifying its public forum analysis in the case of residential streets and sidewalks or, as Justice Stevens has intimated, consider some other analytical approach in cases involving First Amendment issues. *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 833, 833 n. 1, 105 S.Ct. 3439, 3465, 3465 n. 1, 87 L.Ed.2d 567 (1985) (Stevens, J., dissenting). Perhaps residential streets and sidewalks should be reclassified as a special type of forum because of the residential privacy interests involved. I wonder if the citizens who live on primarily residential streets ever considered these streets to be "traditional public fora" as described by the courts in this country. In many residential areas, especially subdivisions, the fee to the land underlying the streets and sidewalks may still be owned by adjacent property owners (and not the public) with a government body owning only an easement in trust for purposes of providing a public right-of-way. In many municipalities, the owner of land on which the sidewalk is located, and not the general taxpaying public, is responsible for the actual maintenance of the sidewalk, including the cost. These factors, plus the importance of residential privacy interests lead me to believe that it's time to reconsider whether all streets over which the public may travel are traditional public fora.

Based on the foregoing, I believe that the district court did not abuse its discretion in either issuing the preliminary injunction at issue or in determining its scope. Because I would affirm the district court, I now, respectfully, dissent.