_____

No. 95-2234
_____

Carol Douglas; Michael Allen          *
Henry; Deena Shelton,                 *
                                      *
        Plaintiffs - Appellants,*
                                      *
                                      *
    v.                                *
                                      * Appeal from the United States
Robert Brownell, in his official* District Court for the
capacity as Mayor of the City of* Southern District of Iowa.
Clive; James C. Wine, in his          *
official capacity as the city         *
attorney of the City of Clive;        *
Dean Dymond, in his official          *
capacity as Chief of Police of        *
the City of Clive; Clive City         *
Council, Sued as: City of Clive *
City Council; Clive, IA, City of*
                                      *
        Defendants - Appellees.    *


_____

                 Submitted:  December 11, 1995

                 Filed:  July 9, 1996
_____

Before MCMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.


    Carol Douglas, Michael Allen Henry and Deena Shelton[1]

_____

    [1]The appellants refer to themselves as abortion protesters in
their brief, based on their "firm belief that abortion is the
intentional destruction of life."  Accordingly, we will likewise
refer to the appellants as "protesters," their preferred
descriptive title, in this opinion.

challenge the constitutionality of a residential picketing ordinance and a parade permit ordinance enacted by the City of Clive, Iowa.  The City enacted the ordinances in response to complaints about weekly protests held in front of the home of Dr. Herbert Remer, a physician who performs abortions.  The district court held that Dr. Remer's move from Clive rendered the case moot, and, alternatively, that the picketing and parade ordinances were constitutional as written and applied.  On appeal, the protesters argue that they still have standing to challenge the residential picketing ordinance and that the two ordinances violate their First Amendment rights.  We hold that the protesters have standing, and we reverse the district court's ruling on mootness.  We affirm the district court's holding that the residential picketing ordinance is constitutional, but we conclude that the parade ordinance is not narrowly tailored, and therefore, reverse the district court's holding that the parade ordinance is constitutional.

In the summer of 1992, members of Operation Rescue began picketing at Dr. Remer's home.  Dr. Remer lived at 1637 N.W. 100th Place, a short, angular street between two larger streets.  Dr. Remer and his neighbors complained to the City, and the City enacted a residential picketing ordinance.  The ordinance makes it unlawful:  "for any person to engage in picketing before, about, or immediately adjacent to, the residence or dwelling of any individual in the City."[2]

---

[2]The intent of the ordinance is stated in Section 1:

Section 1. INTENT.  It is the intent of this Ordinance to protect the public health and welfare of the citizens of Clive, and the good order of the community, by preserving the right of privacy and the feeling of well-being and tranquility that members of the community should enjoy in their residence or dwelling.  The practice of picketing before or about residences or dwellings causes emotional disturbances and distress to the occupants, disturbs the sense of peace and tranquility traditionally enjoyed by individuals in their residences, and obstructs and interferes with the free use of public sidewalks and public streets.  Picketing before or about residences or dwellings has, as its object, the harassment of the occupants of the dwelling or residence.  Without resort to this practice, full opportunity

-2-

The protesters reacted to the ordinance by expanding their picketing to cover the 1500-1700 blocks of N.W. 100th Place surrounding Dr. Remer's home. The City Council then amended its parade ordinance, requiring a written permit from the Chief of Police for a parade. A "parade" is defined to include "any march or procession of ten (10) or more persons . . . organized for marching or moving on the streets, sidewalks, or other public ways in an organized fashion. . . ." A permit application must be submitted at least five days before the parade, and the City must issue the permit no later than the second business day after receiving the application unless: (1) the Police Chief determines that the time, route or size of the parade will disrupt the use of any street or sidewalk which is ordinarily subject to significant congestion or traffic; (2) another parade permit has already been issued for that day; or (3) the proposed parade violates any other governing law or ordinance.[3]

The protesters brought a 42 U.S.C. § 1983 action against the City,[4] alleging that the residential picketing ordinance and parade ordinance violated their constitutional rights to freedom of speech, freedom of assembly, freedom of association, freedom to petition, free exercise of religion, and equal protection under the law. The protesters sought damages, as well as declaratory and

exists, and will continue to exist, in other appropriate locations, for the free flow of ideas, and the exercise of freedom of speech or expression and other constitutional rights.

[3]The applicant must also state the date and time of the parade; the name, address and telephone number of the applicant; the parade route; and the approximate number of persons and vehicles in the parade.

[4]The protesters named as defendants the Clive Mayor, city attorney, city council, and chief of police in their official capacities.

injunctive relief.

The  istrict court issued a preliminary injunction, enjoining the
                    he residential picketing ordinance outside the "zone
of privacy."  The cou
of                                                                    s
immediately adjacent to the target resident's ho
protesters' motion to enjoin enforcement of
concluding that it was unlikely that the protesters would prevail on their
      that the ordinance was unconstitutional on its face or as applied.

                                        rs for picketing on the sidewalk
acr    from Dr. Remer's home, the district court clarified its original
        The court stated that the preliminary injunction only "prohibit[ed
picketing in the area, including the
Remer's residence and in front of the two residences immediately adjacent
    eto."  The court clarified that the injunction did "not prohibi
picketing on the sidewalk across the street from those three residences."

                                        mmary judgment, arguing that the
protesters                              or punitive damages, and the case
was now moot because Dr. Remer had moved from Cl
a cross motion for summary judgment,
ordinances unconstitutional and to permanently enjoin
The  pr                                                                ,
including the supplemental affidavit of Dr. Remer stating that he no longer

The City amended its picketing ordinance on November 3, 1994

to conform with the district court's orders.[5]

ict court then entered summary judgment for the City.  The court first ruled that the case was now moot bec
protesters'                                                            e
alternative,                                                          d
picketing ordinance were constitutional.  The court granted the protesters'
to strike certain affidavits and exhibits, except for Dr. Remer's
plemental affidavit.  The court awarded the protesters one dollar i
nominal damages for damages sustained prior to the preliminary injunction.

## I.

The protesters first argue that they have standing.  They asser
Dr.                                                                    l
in place.

iction
of    deral courts to actual, ongoing cases or controversies.  <u>Lewis v</u>
<u>Continental Bank Corp.</u>, 494 U.S. 472, 477 (1990)  <u>Arkansas AFL-CIO v. FCC</u>,
th Cir. 1993) (en banc).  A "case or controversy" is
"a definite and concr
every stage in the litigation."  ___  (citation omitted).  A case is moot
when    ies no longer have a "personal stake in the outcome of the
"  _____, 494 U.S. at 478 (internal quotation and citation

---

[5]

It shall be unlawful for any person to engage in
mediately adjacent to, the
res      or dwelling of any individual in the City of
s section, "before, about,
or immediately adjacent to" means in front of or within

Arkansas AFL-CIO, 11 F.3d at 1435.

The district court concluded that the protesters lost their standing to challenge the ordinance when Dr. Remer moved from Clive.[6] The court reasoned that the protesters did not "identify any residence in Clive for which the ordinance restricts their picketing activity."

The City maintains that the protesters lost their standing when Dr. Remer moved from Clive, and that the circumstances of this case are analogous to those in Golden v. Zwickler, 394 U.S. 103 (1969). In that case, a New York statute made it a crime to distribute anonymous literature in connection with an election campaign. Id. at 104. Zwickler was convicted of violating the New York statute by distributing anonymous handbills criticizing a candidate in a 1964 congressional election. Id. at 105. Although the New York Supreme Court reversed Zwickler's conviction on state law grounds, Zwickler sought a declaratory judgment that the statute was unconstitutional.

Following Zwickler's conviction, the congressman criticized by Zwickler left the House of Representatives to become a judge with a fourteen-year term. Id. at 106, 109 n.4. The case was moot because the sole target of Zwickler's handbills was no longer a candidate or potential candidate. The Court reasoned that it was doubtful that the congressman would run for Congress again and, therefore, the dispute lacked "immediacy and reality." Id. at 109. It was "wholly conjectural that another occasion might arise when

_____

[6]The protesters also argue that the district court abused its discretion in allowing the submission of Dr. Remer's supplemental affidavit. Dr. Remer's affidavit concerned the issue of the court's jurisdiction, and we have no trouble concluding that it was well within the court's broad discretion to accept the affidavit. See Bueford v. Resolution Trust Corp., 991 F.2d 481, 485 (8th Cir. 1993) (party or court may raise issue of subject matter jurisdiction at any stage of the litigation).

-6-

Zwickler might be prosecuted" for distributing anonymous handbills.  <u>Id.</u> at 109.

The record in this case differs from that in <u>Zwickler</u>.  The plaintiff in <u>Zwickler</u> distributed the handbills because he objected to a specific candidate.  When the candidate left his elected office and effectively resigned from politics, Zwickler no longer had a personal stake in the outcome of the case.  <u>Lewis</u>, 494 U.S. at 477-78.  The protesters here have a much more general objection:  abortion.  Dr. Remer's move from Clive has not eliminated their objection to abortion.  Moreover, the protesters did not specify that they wanted the ordinance struck down in order to picket Dr. Remer's residence.  The protesters provided affidavits stating that they wished to participate in protests at N.W. 100th Place and "other residential areas," and in "other public ways in residential areas in the city of Clive, Iowa."  Contrary to the view of the district court, we do not believe that the protesters are required to identify a specific home they wish to target in order to challenge the picketing ordinance.  Even though Dr. Remer has moved from Clive, the protesters have stated an actual or threatened injury because the ordinance continues to apply to all the residential areas in Clive.  Dr. Remer's move does not nullify the protesters allegations of actual and threatened injury caused by the ordinance.  <u>Cf.</u> <u>Beck v. Missouri State High Sch. Activities Ass'n.</u>, 18 F.3d 604, 605-06 (8th Cir. 1994) (per curiam) (student's challenge to eligibility requirement became moot when student subsequently complied with requirement); <u>McFarlin v. Newport Special Sch. Dist.</u>, 980 F.2d 1208, 1210-11 (8th Cir. 1992) (student's challenge to high school regulation became moot when student graduated).  Thus, the protesters have satisfied the mandates of Article III, and have standing to challenge the

ordinance.[7]  See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982).

We reverse the district court's ruling that the protesters' challenge to the residential picketing ordinance is moot because Dr. Remer has moved from Clive.

**II.**

The protesters argue that the residential picketing ordinance is unconstitutional on its face and as applied.

The protesters and the City agree that the constitutionality of the residential picketing ordinance is determined by the Supreme Court's decisions in Frisby v. Schultz, 487 U.S. 474 (1988), and Madsen v. Women's Health Ctr., Inc., 114 S. Ct. 2516 (1994).

In Frisby, the town of Brookfield, Wisconsin, passed an ordinance making it "unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." 487 U.S. at 477.

In determining the constitutionality of the anti-picketing ordinance, the Court first recognized the importance of the speech inhibited by the ordinance. Id. at 479. "The antipicketing ordinance operates at the core of the First Amendment by prohibiting . . . picketing on an issue of public concern." Id. Because of these concerns, the Court determined that the antipicketing ordinance was subject to "careful scrutiny." Id. (citing Boos v. Barry, 485 U.S. 312, 318 (1988)).

---

[7]Because we conclude that the case is not moot, we need not consider the protesters' alternative argument that the case falls within an exception to the mootness doctrine because it is "capable of repetition yet evading review." See Arkansas AFL-CIO, 11 F.3d at 1435.

The Court then considered the appropriate limits which the City could place on such protected speech. The Court recognized that the limits vary according to the type of forum, applying the most stringent standard to protected speech in a "traditional public forum:"

> [In a public forum] the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

Id. at 481 (quoting Perry Ed. Ass'n. v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)).

In applying these standards to the Brookfield ordinance, the Court first held that the street and sidewalks were traditional public fora. Id. at 480-81. After deferring to the lower courts' interpretation that the ordinance was content neutral, the Court focused on the remaining two questions: whether the ordinance was narrowly tailored to serve a significant government interest and whether the ordinance left open ample alternative channels of communication. Id. at 482 (quotation omitted).

The Court first answered the latter question, ruling that the ordinance preserved ample alternative channels of communication. Id. at 484. The Court narrowly construed the ordinance as prohibiting only "focused picketing taking place solely in front of a particular residence." Id. at 483. The Court specifically found that the ordinance, among other activities, did not prohibit "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." Id. This being the case, the ordinance preserved ample alternative channels

of communication.  Id. at 484.

The Court then recognized that the ordinance served the significant government interest of protecting residential privacy. Id.  "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Id. (quoting Carey v. Brown, 447 U.S. 455, 471 (1980)).  The Court emphasized "the unique nature of the home, `the last citadel of the tired, the weary, and the sick,'" id. (quoting Gregory v. Chicago, 394 U.S. 111, 125 (1969) (Black, J., concurring)), and acknowledged the special protection accorded to unwilling listeners within their own homes:  "[W]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom." Id. at 485.

After discussing these competing interests, the Court considered whether the ordinance was narrowly tailored. Id.  The Court recognized that a complete ban on picketing is narrowly tailored only if each prohibited activity is an "appropriately targeted evil." Id.  The Court concluded that the focused picketing prohibited by the ordinance is fundamentally different from more generally directed forms of communication, such as handbilling, soliciting, and marching, because focused picketing "is narrowly directed at the household, not the public," and the picketers "do not seek to disseminate a message to the general public, but to intrude upon the targeted resident . . . in an especially offensive way." Id. at 486.  Even assuming the picketers have a broader communicative purpose, the Court concluded that residential picketers inherently and offensively intrude on residential privacy much more than more general forms of communication, because the targeted resident cannot avoid the picketers' message in his own home. Id.  The Court concluded the anti-picketing ordinance was narrowly tailored, as it sought to eliminate the "evil" of subjecting a resident to unwanted and

unavoidable speech.  Id. at 487.

More recently, the Supreme Court decided the constitutionality of an injunction prohibiting several activities of abortion protesters.  One provision of the injunction prohibited protesters from "congregating, picketing, patrolling, demonstrating or entering" any portion of the public right-of-way or private property within thirty-six feet of the property line of an abortion clinic.  Madsen, 114 S. Ct. at 2522.  The Court first decided that an injunction is subject to a more rigorous standard than an ordinance.  Id. at 2525.  The Court explained that it applied more rigorous scrutiny to an injunction which restricts expression than to legislation which does so because "[i]njunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances."  Id. at 2524.  An injunction must not burden "more speech than necessary to serve a significant government interest."  Id. at 2525.

The Court then upheld the provision of the injunction which prohibited picketing within thirty-six feet of the clinic's entrance and driveway.  Id. at 2526-27.  The Court concluded that the buffer zone did not burden more speech than necessary to accomplish the government interest in protecting access to the clinic and facilitating traffic flow on the street.  Id. at 2527.  The Court struck down, however, the thirty-six foot buffer zone enforced on the back and side of the clinic.  Id. at 2528.  The Court reasoned that there was no evidence that the protesters on the clinic's back and side obstructed access to the clinic, blocked traffic, or unlawfully interfered with the clinic's operation.  Thus, this portion of the buffer zone failed to serve the identified interests.  Id.

The Court also struck down two other parts of the injunction. One part of the injunction prohibited picketing, demonstrating, or using sound amplification equipment within 300 feet of the

-11-

residences of clinic staff, and also prohibited protesters from impeding access to any street that provides the sole access to streets for those residences. Id. at 2522. Although the Court reiterated the important government interest in protecting the tranquility and privacy of the home, id. at 2529-30, the Court concluded the 300-foot zone was too large, id. at 2530. The Court distinguished the 300-foot zone from the zone approved in Frisby, stating that the prohibition in Frisby was "limited to `focused picketing taking place solely in front of a particular residence.' By contrast, the 300-foot zone would ban '[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses.'" Id. at 2530 (quoting Frisby, 487 U.S. at 483). The Court held that the record did not justify the 300-foot buffer zone, and suggested that "a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result." Id.

The protesters do not argue that the Clive picketing ordinance fails the content-neutrality test. The protesters contend that the Clive ordinance fails because it is not narrowly tailored and does not leave open ample alternatives for communication. The protesters contend that the ordinance is much broader than that approved in Frisby on several grounds. First, they contend that the ordinance is not narrowly tailored because it prohibits picketing on both sides of the targeted residence, and prevents protesters from even passing by the targeted residence or the houses on each side. Next, the protesters contend that the ordinance is not narrowly tailored because it prohibits all expressive activity, including prayer, within the three-house zone. Finally, the protesters say the ordinance is not narrowly tailored because it applies to the picketing of commercial establishments, if the commercial establishment happens to be next door to a residence, which violates our decision in Pursley v. City of Fayetteville, 820 F.2d 951, 956-57 (8th Cir. 1987). We address these grounds in turn.

-12-

The protesters contend that under Frisby, the maximum space that free speech can be totally banned in a residential area is the area "solely in front of a particular residence."  487 U.S. at 483. As additional support, the protesters rely on language from Madsen explaining that Frisby only prohibited "focused picketing taking place solely in front of a particular residence."  Madsen, 114 S. Ct. at 2530 (quoting Frisby, 487 U.S. at 483). Finally, the protesters cite for support a decision from the Sixth Circuit, Vittitow v. City of Upper Arlington, 43 F.3d 1100 (6th Cir.), cert. denied, 115 S. Ct. 2276 (1995), and a decision from this circuit, Kirkeby v. Furness, 52 F.3d 772 (8th Cir. 1995).

In Vittitow, the Sixth Circuit reviewed an ordinance similar to the Clive ordinance.  The ordinance prohibited picketing in front of a targeted home, and the two homes on either side of the targeted home.  Id. at 1101. The district court issued an order preliminarily enjoining the city from enforcing the ordinance as written.  Id. at 1102.  The court provided, however, for conditional enforcement of the ordinance.  The court stated that the city could prevent the protesters from picketing in front of the doctor's home and the two homes on either side of the doctor's home.[8]  Id. at 1103.  The Sixth Circuit concluded that the ordinance, as written, was inconsistent with Frisby and Madsen, making "suspect," if not prohibiting outright, a ban on picketing which extends "beyond the area solely in front of a particular residence."  Id. at 1105 (internal quotations omitted).

In Kirkeby, this court considered a residential picketing ordinance enacted by the city of Fargo, North Dakota, which banned picketing within 200 feet of a residential dwelling and in "restricted picketing zones." 52 F.3d at 773-74.  We concluded

---

[8]It is impossible to tell from the wording of the injunction in Vittitow if the injunction created a three-house zone like the Clive ordinance or a five-house zone.  43 F.3d at 1105, n.6.

-13-

that the protesters were entitled to a preliminary injunction enjoining enforcement of the ordinance. Id. at 775-76. In considering whether the protesters were likely to succeed on the merits, we first concluded that the 200-foot zone was unconstitutional on its face under the combined authority of Frisby and Madsen as "almost certainly too restrictive of the right to speak freely in public." Id. at 774. We concluded that the 200-foot zone made the case "much closer to Madsen than to Frisby. Id. at 775. We characterized the zone picketing provisions as "even more dubious." Id. at 775. The zone picketing provisions authorized the Board of City Commissioners to establish a restricted picketing zone in a neighborhood for up to one year. Id. at 774. We concluded that the zones were not narrowly tailored to accomplish the permissible goals of the ordinance. Id. at 776.

The protesters read the Supreme Court's decisions in Frisby and Madsen and our decision in Kirkeby to allow an absolute ban on picketing only in the area directly in front of the targeted residence.[9] The

_____

[9]The Supreme Court recently granted certiorari from the Second Circuit's decision in Pro-Choice Network v. Schenck, 67 F.3d 377 (2d Cir. 1995) (en banc), cert. granted, 116 S. Ct. 1260 (1996). In that case, the Second Circuit considered the constitutionality of two provisions of an injunction directed to abortion clinic protesters. Id. at 381. The Second Circuit first upheld a provision of the injunction establishing a fifteen-foot buffer zone. Id. at 387. The buffer zone required demonstrators to remain at least fifteen feet from all entrances to the abortion clinic as well as women and staff seeking access to the clinic except that two "counselors" could enter the buffer zone to engage in "non-threatening conversation" with each person or group of persons approaching or leaving the clinic. Id. at 387. The Second Circuit rejected the protesters' argument that the fifteen-foot buffer zone is more burdensome than necessary, concluding that the zone was consistent with Madsen. Id. at 390.

The Second Circuit also upheld the "cease and desist" provision of the injunction, prohibiting protesters from "counseling" patients within the zones when the patient expresses a desire to be left alone. Id. at 390, 392. The court rejected the argument that the provision was overbroad and found the provision necessary to protect access to abortions and to protect the well-being of women seeking access to abortion services. Id.

-14-

protesters say that any prohibition which goes

_____

at 392-93.  The Supreme Court's decision in <u>Pro-Choice Network</u> will be, at best, only instructive because the case involves an injunction, not an ordinance, and also considers a buffer zone around a clinic, not a home.

beyond the area solely in front of the targeted residence is not narrowly tailored. The protesters characterize Frisby as permitting a very limited ban: "only focused picketing taking place solely in front of a particular residence." 487 U.S. at 483. The protesters complain that the Clive ordinance condemns not only those who demonstrate in front of a targeted residence and the adjacent houses, but also the individuals who merely pass by the targeted residence and the adjacent houses.

We do not read Frisby as establishing a bright-line rule authorizing a limit on picketing only in the area directly in front of a targeted residence. The Court's concern in Frisby was not so much the size of the prohibited zone, but the impact the ban had on protected activity. The Court stressed that the ordinance applied to picketing "focused on" and "directed at" a particular residence. Id. at 482-83. The Court found residential picketing different from other forms of communicative activities, such as door-to-door solicitation and the distribution of handbills, because the targeted resident cannot avoid the picketers. The Court emphasized: "[t]here simply is no right to force speech into the home of an unwilling listener." Id. at 485. Although the Court in Madsen repeated the language that Frisby prohibited only "focused picketing taking place solely in front of a particular residence," the Court considered an injunction, not an ordinance, and a 300-foot buffer zone, not an area covering the particular residence and the two adjacent houses. Nor do we believe our decision in Kirkeby defined the outer limits of focused residential picketing. Indeed, we recently concluded that police officers were entitled to qualified immunity for arresting protesters, who were picketing

-16-

houses adjacent to the targeted dwelling, pursuant to the Fargo, North Dakota, residential picketing ordinance. Veneklase v. City of Fargo, 78 F.3d 1264, 1267-68 (8th Cir. 1996). We acknowledged that Frisby did not resolve the question of whether an ordinance may restrict abortion protesters from picketing houses adjacent to the targeted dwelling. Id. at 1268-69.

Obviously, there is a direct relationship between the size of the prohibited zone and the impact on protected speech.[10] Nevertheless, we do not read Frisby as requiring us to strike down the ordinance as not narrowly tailored simply because the ordinance extends beyond the area solely in front of the targeted residence.

Rather, the question is whether the ordinance is specifically aimed at protecting the residents of Clive from unwanted and unavoidable speech and does not sweep within its ambit other activities that constitute an exercise of First Amendment rights. Frisby, 487 U.S. at 483-88. See also Ward v. Rock Against Racism, 491 U.S. 781, 799-800 & n.7 (1989); Thornhill v. Alabama, 310 U.S. 88, 97 (1940). We are satisfied that the three-house zone is narrowly tailored. Unlike the injunctions in Madsen and Kirkeby, the picketing ordinance allows picketing through the neighborhood and on the sidewalk directly across from the targeted residence. Although the ordinance prohibits protesters from standing directly in front of the targeted residence and the residences on each side, the ordinance does not prohibit the picketers from picketing on the sidewalk directly across the street from those three houses. The protesters' argument that the ordinance prevents them from "passing by" the targeted residence is foreclosed by the district court's interpretation, following Frisby, that the ordinance applies only to "focused" picketing. 487 U.S. at 483. Moreover, in Frisby, the protesters congregated only in front of the targeted physician's

_____

[10]Dr. Remer's former home and the adjacent houses sit on lots 75 feet in width.

-17-

home.  487 U.S. at 476.  Here, the protesters congregated not only in front of Dr. Remer's home, but also in front of his neighbor's homes.  Dr. Remer's neighbors objected to the protesters and the protesters interference with their "domestic peace and tranquility."  Many of Dr. Remer's neighbors signed a petition stating that the protesters prevented them from "go[ing] about our own daily activities."  There was evidence that at least on one occasion one of the protesters used binoculars to look into the Remer residence from the sidewalk across the street from the residence.  The extension into the adjacent 75 foot lots is only slightly more than the 36 foot buffer zone approved in Madsen.  More significantly, however, is that the ordinance is limited to the particular focus of the picketing and the houses on each side.  Thus, the record supports the conclusion that the ordinance is narrowly tailored to serve an important government interest.

Although the Sixth Circuit decision in Vittitow is not binding on this court, we do not believe it is entirely inconsistent with our holding. In that case, the Sixth Circuit interpreted the ordinance to result in a "complete ban on residential picketing."  43 F.3d at 1107.  As discussed, the Clive ordinance does not result in a complete ban on residential picketing.  In addition, Vittitow, like Madsen, involved the constitutionality of an injunction, not an ordinance.  As the Supreme Court instructed, an injunction must be more precise than an ordinance.  Madsen, 114 S. Ct. at 2524-25.  An injunction must "burden no more speech than necessary," id. at 2525, while an ordinance must only be "narrowly tailored," Frisby, 487 U.S. at 482.

The protesters also contend that the ordinance is not narrowly tailored and fails to leave open ample alternative channels of communication because the ordinance prohibits all modes of communication within the three-structure zone, not just focused picketing.  They characterize the ordinance as prohibiting all expressive activity, including prayer, within the three-structure

-18-

zone.  They contend that banning all expressive activity does not line up with Frisby, which permits only a ban on focused picketing, and also violates the Free Exercise Clause.

We reject the protesters' construction of the ordinance.  The only protected activity the ordinance prohibits is picketing directly in front of the targeted resident's home and directly in front of the house on each side of the targeted residence.  "Picketing" does not require that the protesters carry a sign, Frisby, 487 U.S. at 483, and "picketing" can include a wide variety of activities, including prayer, see id. at 486 (defining the conduct falling within the picketing ordinance as conduct not for the purpose of disseminating a message to the general public, but for the purpose of intruding on the targeted resident).  The protesters can picket, march, preach, or pray anywhere in the residential area except in the three-structure zone.  Indeed, the protesters can picket, march, preach, or pray directly across the street from the targeted house and the house on each side of the targeted house.  The ordinance preserves ample alternative channels of communication.

We are unpersuaded by the protesters' argument that the ordinance is particularly offensive because it prohibits prayer within the three-structure zone.  The protesters' prayer was only part of a pattern of conduct "focused on" and "directed at" the targeted residence.  See Frisby, 487 U.S. at 482-83.  The Supreme Court rejected an analogous argument in Cox v. New Hampshire, as "beside the point," concluding that a parade permit ordinance did not interfere "with religious worship or the practice of religion in any proper sense . . . [and] only [constituted] the exercise of local control over the use of streets . . . ."  312 U.S. 569, 578 (1941).

Finally, we reject the protesters' argument that the ordinance is not narrowly tailored because it applies to picketing of

commercial establishments.  First, the Clive ordinance, on its face, does

inance restricts itself to

"one _____ on either side of a residence or dwelling."  Second, this court

Pursley v. City of Fayetteville before the Supreme Court decided

Fri___, and therefore, _____'s viability is at least suspect.  Third,

is no suggestion in the record that the City applies the ordinance

commercial establishments.  ___ Ward                                 g

plaint      argument in light of city's policy in administering the


## III.


The      esters next contend that the parade permit ordinance is an

A prior restraint on the exercise of First Amendment rights bears "a heavy

tion against its constitutional validity."  _____l

Amus_____ Co., 445 U.S. 308, 317 (1980) (per curiam).  Nevertheless
certain restrictions on speech in public places are valid.  A city ma
issue                                                               f
speech.  See e.g., ____, 491 U.S. at 791.  Such regulations, however, must

to a government official,"

Forsyth_____, 505 U.S. 123, 130 (1992), and
  ntain narrow, objective, and definite standards to guide licensin
authorities.  Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-5
(1969).  A permit requirement controlling
speech  must  also  be  content-neutral,  narrowly  tailored  to  serve
significant                                                         e
channels for communication.  ____, 491 U.S. at 791.


## A.


The protesters first attack the parade ordinance on the ground that

protesters point out that the Chief of Police can stifle free speech under the guise of determining that "the time, route or size" of the parade "will disrupt" the use of any street ordinarily subject to "significant congestion or traffic."  The protesters complain that there are no standards to guide the Chief of Police in determining if the route, time, or size of the parade will be disruptive.  For example, the protesters contend that the Chief of Police can simply deny the permit based on his belief that the proposed timing of a controversial event will disrupt the use of a main street, and therefore, apply the exception in a content-based fashion.

In Cox v. New Hampshire, the Supreme Court recognized that a city may control the use of its public streets for parades "to promote the public convenience in the interest of all," so long as the control does not "deny or unwarrantedly abridge the right of assembly" and the opportunity for the exchange of ideas "immemorially associated with . . . public places."  312 U.S. at 574.  The Court authorized a permit requirement in order to provide the public with notice of the parade and to assure proper police protection, thereby minimizing the inconvenience to the public caused by the parade.  Id. at 576.  The state supreme court construed the parade permit statute to require the licensing authority to issue a permit to anyone who applied, subject only to the licensing authority's ability to specify the "time, place and manner" of the parade in order to accommodate competing demands for the public use of the streets.  The Court emphasized that there was no evidence that the City had administered the statute other than in a fair and non-discriminatory manner.  312 U.S. at 577.

In Shuttlesworth, the Court invalidated a parade permit ordinance which allowed the City to deny a permit whenever the City thought "the public welfare, peace, safety, health, decency, good order, morals or convenience require[d] that it be refused."  394 U.S. at 156.  Despite the Alabama Supreme Court's construction of

-21-

the ordinance as an "objective and even-handed regulation of traffic," ___
at                                                                        e
ordinance had been administered to "deny or unwarrantedly abridge the right
                    emorially associated with . . . public places," id.
           Cox, 312 U.S. at 574).


          Court struck down a parade permit imposing a permit fee i
Forsyth County, 505 U.S. at 130.  The ordinance
thousand dollars for each day "such parade, procession, or open air public
          shall take place."  ___ at 126.  Because the ordinance did not
                   rds for prescribing the amount of the permit fee and
allowe   the administrator to examine the content of the prospective
          message in assessing the fee, the Court invalidated the ordinanc
as vesting "unbridled discretion in a government official."  Id.


     The Clive parade permit is not as opaque as the protesters suggest.
                    s the Chief of Police to issue the permit unless the
time,       , or size of the parade will disrupt the use of a street
                                         traffic."  This exception
is                                  the time, route, and size of the parade.
Cf. Forsyth County                                                        e
Chief    Police to consider the content or purpose of the parade.
                                         applied the parade permit
ordinance so as to restrict freedom of speech or assembly rights.


     The prot                                                             o
muc   discretion to the Chief of Police because it allows the Chief of
                                         ivities.  Because the City
has                                                                       e
pro       argue that the City can select one application over another,

It is true that the ordinance does not prioritize competing permit applications. Nevertheless, there is no evidence or indication that the City has administered the permit requirement so as to pick and choose over competing applications based on content. The Chief of Police submitted an affidavit stating that he does not intend to use "the two day approval window to seek out other applicants so that a proposed parade by Operation Rescue . . . could be denied on grounds of conflict or use the provision in any other way to censor or burden the speech of Operation Rescue or anyone else." Moreover, the ordinance states that the second exception applies only if a parade permit "already" has been granted. The City states in its brief that the only way the exception can be administered is to issue permits on a "first-in, first-out" basis. There is no evidence or indication that the City will manipulate the ordinance as suggested by the protesters. See Poulos v. New Hampshire, 345 U.S. 395, 404-08 (1953).

The protesters allege that the third exception, allowing the Chief of Police to deny a permit on the basis that the proposed parade violates another law or ordinance, creates the greatest danger of censorship because this provision allows the Chief of Police to deny a permit based on his opinion that future conduct will be unlawful.

In Haque v. Committee for Industrial Organization, the Supreme Court struck down a parade permit ordinance which authorized a public official to deny a parade permit if the official thought the proposed conduct would cause a riot, disturbance, or disorderly assemblage. 307 U.S. 496, 502 & n.1 (1939). Although recognizing that the City had a substantial interest in protecting streets and parks for the use of all, the ordinance did "not make comfort or convenience in the use of streets or parks the standard of official action." Id. at 516 (opinion of Roberts, J., joined by Black, J.); Poulos, 345 U.S. at 407-08 ("we have consistently condemned licensing systems which vest in an administrative official

discretion to grant o

proper                                                                    n

omitted)).                                                                 e

believ   that the parade would cause riots, disturbances, or disorderly

             The exception in the Clive ordinance, however, is aimed at

         public places, not speech.  The Chief of Police may not apply

    exception based on his belief that the proposed parade might caus

unlawful                                                                   y

when, on its face, the proposed parade will viol


**B.**


    The                                                                    t

narrowly tailored bec

that                                                                       y

legitimate                                                                 .

.               event occurs, it is often necessary to have one's voice

heard promptly, if it is to be considered at all."  <u>Shuttlesworth</u>          .

at 163 (Harlan, J., concurring).


        support, the protesters cite _____, 33

     1200 (9th Cir. 1994), and _____, 743 F.2d 1346

   h Cir. 1984).  In _____, the Ninth Circuit struck down a parade

    it ordinance requiring seven-days advance notice for permission t

participate                                                                t

1204.                        infirmities with the ordinance, the seven-day

del   and  the  application  of  the  ordinance  to  small  groups  of

        rators.  ___ at 1206.  The court resolved:  "Some type of permit

         <u>may</u> be justified in the case of larg

placed on park facilities and the

park users is more substantial," <u>id.</u>         mply cannot agree that six

to eight people carrying signs in a public park constituted

enough of a threat to the safety and convenience of park users . . . to justify the restrictions imposed on their speech . . . ," id. at 1207. In Richmond, the court struck down a twenty-day notice requirement, concluding the requirement was not the least restrictive means for protecting the City's interest in regulating traffic. 743 F.2d at 1355-57.

The district court concluded that the City could impose the five-day notice requirement reasoning that the City's limited resources and small police force justified the requirement. We are convinced, however, that the five-day notice requirement is not narrowly tailored. In City of Richmond, the court compared the twenty-day notice requirement with the notice requirements of other cities. Id. at 1357. The court pointed out that there is "no basis in logic for cities to demand notice far in advance of parades. Policemen and newsmen are frequently deployed on less than two days notice," id. at 1357 (citing Vince Blasi, Prior Restraints on Demonstrations, 68 Mich. L. Rev. 1482, 1526 (1970)), and that "[t]he only advance notice requirements to be upheld by courts have been dramatically shorter than 20 days," referring to cities with one, two, and three day notice requirements, and some with no notice requirements at all. Id. (citing cases with notice requirements of no more than two days). The five-day notice requirement restricts a substantial amount of speech that does not interfere with the city's asserted goals of protecting pedestrian and vehicle traffic, and minimizing inconvenience to the public. Accordingly, we conclude that the parade ordinance is not narrowly tailored.

We are also concerned about the application of the permit requirement to groups of ten or more persons. We entertain doubt whether applying the permit requirement to such a small group is sufficiently tied to the City's interest in protecting the safety and convenience of citizens who use the public sidewalks and streets. See Cox, 312 U.S. at 576 (recognizing that permit

requirement, applied to a "parade or procession" of five groups of fifteen st of public convenience).
See also _____, 33 F.3d at 1207 n.13 (comparing the Portland ordinance the participant requirements of other cities, and concluding that the cities' ordinances which, in general, had participant requirements at least 50 persons, "appear much more narrowly tailored"); Rosen v Port of P_____, 641 F.2d 1243, 1248 n.8 (9th Cir. 1981) (stating that if 24-hour notice requirement were justified for large groups, it regulating small groups.)  We need say little more, as      otesters have not raised this issue.  We only point out that the permit requirement to groups as small as ten persons compound our conclusion that the parade permit ordinance is not narrowly tailored.

reverse the district court's ruling on the constitutionality of

[11]

The p                                                              e
ordinance   The protesters cite the City's denial of an April 21, 1993,
  rmit application as an illustration of the City's unconstitutiona
application                                                        t
to      uct a parade on N.W. 100th Place, and did not mention Dr. Remer.

---

[11]The protesters also argue th
tailored                                                            l
safeg        in the event the City denies their permit.  The City

receiving the application, allowing a disappointed applicant three
                                                              e five-
day    tal delay is unconstitutional, the City's argument is not

is granted a reasonable period to rule on a permit application.
Slate v. McFetridge, 484 F.2d 1169, 1177 (7th Cir. 1973).

the marchers planned to pray, sing, and read from the Bible, but that they would not picket. The Chief of Police denied the permit on the ground that the parade violated the residential picketing ordinance. The protesters argue that if the Chief of Police evaluated the application on its face, the Chief had no choice but to grant the permit because it was clearly speculation as to whether the protesters would violate the residential picketing ordinance. The protesters also argue that the ordinance is unconstitutional because of unequal enforcement, particularly referring to a 10-kilometer running race through Clive, co-sponsored by the City, which was not subject to the parade permit process. Because we have held the parade ordinance to be unconstitutional on its face, we need not reach these issues.

## IV.

In conclusion, we reverse the district court's ruling that the case is moot. We reverse the district court's alternative ruling upholding the parade ordinance, and hold the parade ordinance is unconstitutional. We affirm the district court's alternative ruling upholding the constitutionality of Clive's picketing ordinance.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.